**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| DEDRICK D. BLAIR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| V. ) | JURY TRIAL DEMANDED |
| ) | |
| KEURIG DR PEPPER, INC., ) | |
| ) | |
| Defendant. ) | |

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Dedrick Blair, hereinafter called "Plaintiff" or "Blair", complaining of and about Keurig Dr. Pepper, hereinafter called "Defendant" or "KDP", and for Cause of Action shows unto the Court the following:

**PARTIES AND SERVICE**

1. Plaintiff is Dedric Blair, a Citizen of the United States and the State of Texas, with a residential address of 5301 Legacy Drive, Plano, TX 75024

2. Keurig Dr Pepper, Inc., is a Delaware Corporation, with a Registered Agent in Texas of CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

**JURISDICTION & VENUE**

3. Jurisdiction for this Civil Rights Action in this Court is found pursuant to 28 U.S.C. Section 1331, as hereinafter more fully appears**.** This Court has supplemental jurisdiction over state law claims discussed below under 28 U.S.C. Section 1367(a) because they arise out of the same case or controversy.

## NATURE OF THIS ACTION

4. This is an action under Title 42 U.S.C. Section 2000e et. seq. and 42 U.S.C. Section 1981 as amended by the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of race.

## FACTUAL ALLEGATIONS

5. Dedrick Blair, an African American man, began working at Keurig Dr. Pepper on April 11, 2016. At the end of his employment, he was working as a Trainer/ Shift Lead, in charge of the warehouse including forklift drivers and pallet builders (order selectors).

6. Blair was subjected to racial discrimination during the term of his employment and terminated from his position because of his race on November 7, 2019 and replaced by a white male.

7. Blair was the only African American shift lead in his department and was routinely treated differently than other white employees.

8. Blair was terminated from KDP after being accused of helping a worker pass a drug test by supplying a urine sample for that worker after the worker had an accident in the workplace. However, Blair did not supply the urine sample to the worker.

9. Blair received yearly evaluations based on how well he trained new hires. He received good evaluations and was never disciplined or put on an improvement plan.

### Prior Complaint of Discrimination

10. In May 2019, Blair was in an employee meeting and spoke up about racial discrimination. He complained that the African American workers were treated differently in that it was more difficult for them to get new assignments or any assignments in a department other than the warehouse.

11. The custom at KDP was after six good months of employment, an employee would be eligible for other available positions. However, Blair observed over time that KDP tended to keep Black employees in the warehouse, rather than give them other opportunities in other departments.

12. After the meeting where Blair had spoken, supervisors began treating him differently. They stopped speaking to him directly. Instead, they talked to the other Shift Lead, Sammie Martinez (White), and Martinez would communicate the information to Blair.

13. Subsequently, the supervisors began leaving Blair out of department meetings on a regular basis.

## False Accusation Against Plaintiff

14. On Friday November 1, 2019, Supervisor, Frank Polero, directed Blair to fill in for a forklift driver who had called in sick.

15. Even though driving a forklift was not part his regular job duties, Blair was on the forklift the entire day. While Blair was working, Brenda Brown, a truck checker, came to him and told him that Ricky Lock, another forklift driver, had broken a main water line valve.

16. Blair addressed the issue with Lock and explained to Lock that he would probably have to take a drug test.

17. When Blair told Lock that he would likely have to take a drug test, Lock responded, "Bullshit, it wasn't my fault."

18. Blair also called his supervisors, Frank Polero ("Polero") and Joe Ambrees ("Ambrees"), both White males, to tell them about the incident.

19. Another employee, Hunter, had put the pallets in the wrong place, and Francisco asked Lock to move them instead of asking Hunter. The main water valve burst when Ricky was

attempting to balance out the pallets by moving a small stack.

20. Blair observed the incident on video, and it appeared to him that the pallets were not stacked correctly, which was not actually Lock's fault. When Lock attempted to move a small stack of pallets, some of the pallets hit the main pressure valve and water started leaking from the valve.

21. After talking to supervisors, Lock came back to Blair and said the supervisors told him to get back to work.

22. About 30 minutes later, Lock ran up to Blair's forklift and asked, "Have you seen my wallet?" Frank Polero was with Ricky at the time.

23. Blair answered, "No," and kept working.

24. Lock walked to the office toward the front of the building, and Polero remained with him.

25. Plaintiff thought it was strange that Polero was allowing Lock to walk around so much if he was supposed to be taking a drug test.

26. Upon information and belief, Polero and Ambrees allowed Lock the opportunity to find another employee to give him a urine sample.

27. On November 6, 2019, Blair was called into the office for a meeting with a human resources representative and James Moore ("Moore"), Blair's manager. He was told that he was being investigated for helping Lock pass a drug test, ostensibly by giving him a bottle of urine.

28. Blair was shown a video and was asked what Lock had grabbed from Blair's forklift. Based on what Blair could see on the video, there was nothing indicating that Lock had grabbed anything from the forklift.

29. Blair did not know what, if anything, Lock had taken from the forklift he was

driving. When Blair was on the forklift, Lock came up to him from behind the forklift, so if Lock did anything behind him, it was not in Blair's line of vision.

30. Not only was Blair not aware that Lock used drugs, he did not have the time or means to help Lock pass a drug test, because he continued working on the forklift, with no time or opportunity to provide a urine sample to anyone.

31. In addition, Polero and Ambrees were the supervisors responsible for getting Lock to take the drug test after the incident.

32. Nevertheless, Blair was terminated on November 7, 2019, at the end of his shift.

33. Moore told Blair that there was no evidence that Blair did anything wrong concerning Lock and his drug test.

34. Blair is aware that Lock was given two drug tests. The first test had no witness and was inconclusive. The second test had a witness, but it was also inconclusive and was sent to a lab. Lock was subsequently terminated.

35. Blair later found out that the workers who gave Lock urine for his drug test were David Campbell and Paul Miles, both order selectors. Witnesses came forward after they found out that Blair was fired. The witnesses said they knew Blair did not give the urine sample to Lock.

36. Blair spoke to Moore and asked that his termination be rescinded in light of what the witnesses said, but he was not successful.

37. Blair spoke to Shiloh in HR and asked how he could be terminated without proof of wrongdoing. Shiloh said they had proof on video that Blair gave Lock a bottle of urine because she did not see both of Blair's hands (only his right) on the steering wheel when Lock ran up to the forklift.

38. Blair observed both of his hands visible on the steering wheel in the video of the

incident he had watched.

39. Shiloh also said they had a witness. Blair is aware that the only person present when Lock ran up to his forklift was Frank Polero.

40. Several workers called the hotline and spoke up for Blair. An investigation into Blair's termination should have been opened.

41. Shiloh told Blair that she would talk to Moore but that Blair's termination would probably not be overturned.

### Different Treatment

42. Company Policy requires that if there is an allegation of wrongdoing, the wrongdoing must be witnesses by at least two other employees.

43. However, it appears that Blair was terminated on the testimony of Frank Polero only.

44. Blair observed that White workers violated company policy regularly but were not terminated. For example, two White men had accidents and took drug tests that were inconclusive. However, they were not terminated, and their shift leads certainly were not violated for their inconclusive drug tests.

45. Also, a White worker was reported to HR for wrongdoing but was not terminated. If a Black worker was reported to HR, that worker was terminated immediately, unless it was a holiday. If it was a holiday, the Black worker would be terminated after the holiday if accused of wrongdoing.

46. Blair also observed that Black workers were written up more often than White workers.

47. After his termination, Blair was replaced by a white employee.

## COUNT ONE - RACIAL DISCRIMINATION - WRONGFUL TERMINATION BASED ON RACE

48.     Plaintiff repeats and realleges paragraphs above, as if fully set forth herein.

49.     Plaintiff was wrongfully discharged. He was very qualified for his position, he was within a protected class at the time of discharge and, he was replaced by someone outside his protected class.

50.     Plaintiff had received good reviews and did not have any write-ups. He was terminated after a false allegation that was not investigated. Plaintiff was replaced by a white male.

## COUNT TWO - RETALIATION

51.     Plaintiff repeats and realleges paragraphs above, as if fully set forth herein.

52.     Plaintiff engaged in a protected activity, complaining about racism and a difference in treatment at KDP in an appropriate forum, an employee meeting; Defendant took an adverse employment action against Plaintiff by wrongfully accusing him and firing him; a causal connection exists between Plaintiff's protected activity and his ultimate termination.

## RESPONDEAT SUPERIOR AND RATIFICATION

53.     Whenever in this complaint it is alleged that the Defendant did any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, or representatives.

## CONDITIONS PRECEDENT

54.     All conditions precedent to jurisdiction have occurred or been complied with. A charge of discrimination was filed on January 13, 2020 with the Equal Employment Opportunity

Commission within three-hundred days of the acts complained of herein and Plaintiff's Complaint is filed within ninety days of Plaintiff's receipt of the Equal Employment Opportunity Commission's issuance of a right to sue letter which was mailed to Plaintiff's counsel on October 14, 2020.

## **DAMAGES**

55. Plaintiff sustained the following damages as a result of the actions and omissions of Defendant described hereinabove:

    a. All reasonable and necessary Attorney's fees incurred by or on behalf of Plaintiff;

    b. Monetary and/or economic harm suffered by Plaintiff;

    c. Back pay from the date that Plaintiff was denied equal pay for equal work and interest on the back pay in an amount to compensate Plaintiff as the Court deems equitable and just;

    d. All reasonable and necessary costs incurred in pursuit of this suit;

    e. Emotional pain;

    f. Expert fees as the Court deems appropriate;

    g. Front pay in an amount the Court deems equitable and just to make plaintiff whole;

    h. Prejudgment interest;

    i. Loss of enjoyment of life;

    j. Mental anguish in the past;

    k. Mental anguish in the future;

    l. Loss of earnings in the past;

    m. Loss of earning capacity which will, in all probability, be incurred in the future; and

    n. Loss of benefits.

## EXEMPLARY DAMAGES

56. Plaintiff would further show that the acts and omissions of Defendant complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff. In order to punish said Defendant for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for exemplary damages.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Dedrick D. Blair, respectfully prays that the Defendant Keurig Dr Pepper, Inc. be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court; exemplary damages, together with interest as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Dated January 10, 2021

                                                   Respectfully submitted,

                                                   By: /s/ Renea Overstreet
                                                 Renea Overstreet
                                                 Texas Bar No. 24066704
                                                 E-Mail: rdolaw@gmail.com
                                                 2100 N. Main Street, Suite 228
                                                 Fort Worth, Texas 76164
                                                 Tel. (817) 810-9747
                                                 Fax. (1-855) 299-5593
                                                 Attorney for Plaintiff Dedrick D. Blair